## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SHAWN WALKER,              )
                               )
        Plaintiff,          )
                               )
      v.                   )     Civ. No. 14-458-SRF
                               )
CAROLYN W. COLVIN,     )
Commissioner of           )
Social Security,          )
                               )
        Defendant.      )

---

David J. Lyons, Esquire, of The Lyons Law Firm, Wilmington, DE. Counsel for Plaintiff.

Charles M. Oberly, III, United States Attorney and Dina Griffin, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nora Koch, Acting Regional Chief Counsel and Erica Perkins, Assistant Regional Counsel, Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

---

## MEMORANDUM OPINION

Dated: October 13, 2016
Wilmington, Delaware

**FALLON, MAGISTRATE JUDGE**

## I.   INTRODUCTION

Plaintiff Shawn Walker ("Walker") filed this action on April 11, 2014 against defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration (the "Commissioner").  Walker seeks judicial review pursuant to 42 U.S.C. § 405(g) of Administrative Law Judge, Melvin D. Benitz's, October 26, 2012, decision denying Walker's claim for disability benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434 and §§ 1381–1383f.  The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

On June 10, 2014, the parties consented to the jurisdiction of a U.S. Magistrate Judge. The matter was reassigned to the undersigned Magistrate Judge to conduct all proceedings through final judgment. (D.I. 8)

Currently before the court are Walker's and the Commissioner's cross-motions for summary judgment. (D.I. 13; D.I. 19)  Walker asks the court to enter an award of benefits or, alternatively, to remand his case for further administrative proceedings.  (D.I. 14 at 1)  The Commissioner requests that the court affirm the ALJ's decision.  (D.I. 20 at 20)  For the reasons set forth below, Walker's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

## II.   BACKGROUND

### A.   Procedural History

Walker filed DIB and SSI applications on April 16, 2010, claiming a disability onset date of March 25, 2010. (D.I. 11; Tr. at 40–41, 132–33, 134–40).  Walker's claim was initially denied on January 5, 2011, and denied again after reconsideration on August 16, 2011.  (Tr. at 77–81,

84–88)  On October 26, 2012, after a hearing on October 11, 2012, the Administrative Law Judge, Melvin D. Benitz (the "ALJ"), issued an unfavorable decision, finding Walker was not disabled under the Act for the relevant time period from March 25, 2010 to October 26, 2012. (*Id.* at 20–31)  The Appeals Council subsequently denied Walker's request for review on March 7, 2014, and the ALJ's decision became the Commissioner's final decision.  (*Id.* at 1–4)  On April 11, 2014, Walker brought a civil action in this court challenging the ALJ's decision.  (D.I. 1)

        **B.**     **Medical History**

          **1. Health history prior to relevant period**

        Walker was born in 1967, and was forty-three years old on his alleged onset date.  (Tr. at 132–40)  He is considered a younger individual under 20 C.F.R. 404.1563(c).  Walker completed high school and has Baccalaureate degrees in biology and nursing.  (*Id.* at 52)  He worked as a registered nurse until his disability onset date.  (*Id.* at 29, 153–54)  He first injured his neck in 1995 in a motor vehicle accident.  (*Id.* at 703–04)  In 1995, he had a C6–C7 anterior cervical discectomy and fusion ("ACDF").  (*Id.* at 452–53)  He made a successful recovery from the surgery.  (*Id.* at 696–98).  To address increased neck pain after another accident on July 7, 2009, Dr. Bikash Bose performed a second ACDF procedure on December 1, 2009 at the C4–C5 and C5–C6 levels, with a disc replacement at C3–C4.  (*Id.* at 432–33, 452–53)  Post surgery, Walker became addicted to prescription pain medication.  (*Id.* at 289, 384, 399, 469)  Walker sought treatment for suicidal thoughts or attempts in 2004, 2007, and 2009. (*Id.* at 57, 362–66, 658).  Walker was admitted to Meadow Wood Behavioral Health following the first attempt, and he was admitted to the Rockford Center following the 2007 and 2009 attempts. (*Id.* at 469)

By January 4, 2010, Walker was doing well, and Dr. Bose instructed him to start driving, resume activities, lift no more than twenty to twenty-five pounds, and wean off medication. (*Id.* at 429) In a January 12, 2010, medical evaluation report, Dr. Leonard Katz noted that Walker reported reduced physical and mental symptoms. (*Id.* at 274–75) Walker's neck remained stiff and painful. (*Id.* at 274–75) On examination, Walker was oriented to time, place, and person, although he seemed somewhat nervous. (*Id.* at 277) Dr. Katz diagnosed him as being in a recuperative state following the surgery with some marked restrictions in the upper extremities. (*Id.* at 278) He expected Walker would be able to return to work in three to six months. (*Id.* at 278–79) On February 1, 2010, Dr. Bose again reported that Walker was doing well and recommended that Walker start a physical therapy program. (*Id.* at 428) On February 15, 2010, Dr. Bose wrote a note excusing Walker from work until February 22, 2010. (*Id.* at 458)

### 2. Health history during the relevant time period

At his disability hearing, Walker alleged disability based on: (1) cervical radiculopathy[1] with hand numbness and shoulder pain; (2) major depressive disorder; and (3) generalized anxiety disorder. (*Id.* at 153)

Walker testified that Dr. Bose instructed him to stop working on March 25, 2010. (*Id.* at 41) The record reflects that Dr. Bose examined Walker on March 26, 2010, and noted that Walker was improving overall and had been weaned off pain medication patches. (*Id.* at 427) Walker told Dr. Bose that his employer would not allow him time off to start a physical therapy program despite Dr. Bose's recommendation for physical therapy. (*Id.*) At the time of the

---

[1] Radiculopathy refers to cervical nerve irritation. It can cause pain, numbness, or weakness. It occurs when a nerve in the neck is irritated as it leaves the spinal canal. UNIVERSITY OF MARYLAND MEDICAL CENTER, http://umm.edu/programs/spine/health/guides/cervical-radiculopathy (last visited Oct. 12, 2016).

examination, Dr. Bose filled out a medical certification form for the Delaware Division of Social Services indicating that Walker was unable to work for six to twelve months due to cervical radiculopathy. (*Id.* at 272)

Walker saw Dr. Bose, again, on June 22, 2010, and he reported having low back pain after falling twice. (*Id.* at 426) While noting that Walker's neck was doing well, Dr. Bose recommended that Walker have an MRI and X-rays to address the low back pain. (*Id.*) Dr. Bose reported that the MRI showed some evidence of lumbar disc disease at L3–L4 and L4–L5. (*Id.* at 425) He advised Walker to start physical therapy and Motrin, but he noted that Walker was receiving in-patient care in a drug rehabilitation facility, and would have to delay the start of his physical therapy program. (*Id.*)

Walker's father, James J. Walker, completed a third party function report for the Social Security Administration on August 1, 2010. (*Id.* at 168–80) Walker's father stated that when Walker was home, despite his condition and frequent pain, Walker's daily activities included reading the paper, watching television, spending time on the computer, attempting exercises recommended by his physician, cleaning cat litter boxes, doing laundry, and going grocery shopping. (*Id.* at 171–76) However, Walker's father noted that Walker's condition limited his ability to do physical activity, and it was difficult for him to sleep at night. (*Id.* at 172)

Walker prepared responses to a pain questionnaire on August 2, 2010. (*Id.* at 200–02) He indicated that he had constant neck and back pain, and that he used a bone stimulator and stretches to help relieve the pain. (*Id.* at 200–01) His usual activities included attending group sessions and walking. (*Id.* at 201)

On September 27, 2010, Dr. Bose wrote a second disability certification stating that Walker was unable to work for an additional six to twelve months due to his prior surgery to treat cervical radiculopathy. (*Id*. at 417)

On December 6, 2010, Kimberlyn Watson, Ph.D. prepared a mental health report on Walker for purposes of the disability determination process. (*Id*. at 467) Dr. Watson recounted Walker's history of suicide attempts, depression, anxiety, and drug addiction. (*Id*. at 469–70) She noted that Walker was well oriented, cooperative, had at least average intellectual skills, no language problems, and intact social judgment and thought. (*Id*.) Dr. Watson opined that he was suffering from a moderate to moderately high level of depression, and a moderate level of anxiety. (*Id*. at 470) However, Walker reported that taking his medication was helpful. (*Id*. at 468, 470) Dr. Watson gave Walker a GAF score of 56.[2] (*Id*. at 471)

Similarly, on December 13, 2010, Dr. Kelly Heath conducted a physical evaluation and prepared a report for the purpose of Walker's disability determination. (*Id*. at 472) Dr. Heath noted deficits with the cervical and lumbar spine. (*Id*. at 473) She diagnosed Walker with

---

[2] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *4 n.9 (D. Del. Oct. 5, 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ...)." *Id*. A GAF of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id*. A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

cervical radiculopathy, lumbar mechanical back pain with possible radiculopathy at L3–L4, anxiety, and depression. (*Id.* at 474) Dr. Heath opined that Walker would have lifelong neck pain, and that he would benefit from weight loss and exercise to manage the low back pain. (*Id.*) She also found that he was limited by his anxiety in novel and stressful situations. (*Id.*) Dr. Heath opined that Walker was able to walk, drive, and speak without difficulty, but he was unable to sit with normal rest breaks; stand for more than ten minutes; lift more than five pounds; or do sedentary work for up to eight hours. (*Id.*)

Walker also visited primary care physicians, Dr. Seth Ivins and Dr. Judy Lim, during the relevant time period. On February 4, 2011, Dr. Ivins completed a functional capacity questionnaire in preparation for Walker's disability hearing. (*Id.* at 520–25) Dr. Ivins indicated that Walker experiences chronic neck pain, exacerbated by lifting more than 15 pounds or by being in one position for more than fifteen minutes, and lumbar disc disease and stenosis. (*Id.* at 520, 526) He indicated that Walker would be able to stand for two hours and sit for four hours total in any given work day, but he would never be able to lift more than twenty pounds. (*Id.* at 523, 527) Dr. Ivins opined that Walker's pain or other symptoms were severe enough to frequently interfere with attention and concentration, but that Walker was capable of low stress jobs. (*Id.* at 522) However, Dr. Ivins noted that Walker was likely to be absent more than four days per month as a result of his condition. (*Id.* at 524, 528) Dr. Ivins expected Walker's condition to last at least twelve months. (*Id.* at 521, 526)

On February 21, 2011, Dr. Bose referred Walker to Dr. Pramod Yadhati for lumbar injections, as Walker's cervical evaluation was within normal limits, but he still complained of pain in his lower back. (*Id.* at 536) Dr. Yadhati reported that Walker complained of low back pain with radiation down his right lower extremity and numbness in his toes. (*Id.* at 724)

Standing, lifting, pushing, pulling, and bending aggravated his pain. (*Id.*) Walker told Dr. Yadhati that he attended physical therapy in 2010 for strength training, but the treatment did not address his pain. (*Id.*) Dr. Yadhati administered five lumbar injections through August 1, 2012. (*Id.* at 743–57) Walker reported significant relief following the May 2011 injection, until the pain recurred in March of 2012. (*Id.* at 733) As a result, he returned to Dr. Yadhati on June 4, 2012 for another injection. (*Id.*) During a consultation on July 16, 2012, Walker reported that his pain increases when performing yard work, but light activity kept his pain stable. (*Id.* at 730)

On June 24, 2011, Dr. Lim completed a medical certification form with respect to Walker's disability determination. (*Id.* at 531) Dr. Lim reported that Walker would be unable to work for at least a year due to low back pain and neck pain. (*Id.*) Despite these comments, she wrote "light duty work" in the remarks section of the same form. (*Id.*)

From August 12, 2011 to October 4, 2012, Dr. Ivins indicated that Walker did not exhibit any psychological signs of anxiety or depression, his musculoskeletal conditions were static, and he was limited only by his range of motion in the lumbar spine. (*Id.* at 758–77) Walker continued to report low back pain. (*Id.*) On June 7, 2012, Dr. Lim submitted a second medical disability form, indicating that Walker would not be able to work for another year. (*Id.* at 692)

### C.    The ALJ Hearing

#### 1. Walker's testimony

Walker testified that his disability onset date was March 25, 2010, the day Dr. Bose found him disabled for six months to a year from working as a registered nurse at Horizon House. (*Id.* at 41) Walker also testified that he lost his nursing license around the same time for stealing pain medication from a former employer after becoming addicted. (*Id.* at 42–43)

Walker stated that he took pain, anti-anxiety, cholesterol, and low testosterone medications. (*Id.* at 44–45) He experienced some drowsiness as a side effect from taking the medications. (*Id.* at 54) Walker also stated that his physician was treating his back and neck pain with injections. (*Id.* at 46) He testified that he experienced pain in his neck, numbness, tingling, and weakness in his upper extremities, and back pain and weakness all across his back and into the lower extremities. (*Id.*) The injections provided relief lasting a few weeks to a month, but he still had breakthrough pain that was not entirely resolved. (*Id.* at 46–47)

Walker explained that he lives with his parents and helped to cut the grass, sweep, cook, and shop, but that he could not do any of those chores without pain. (*Id.* at 50–51) He sometimes walked up to a quarter mile but did not go out socially with friends anymore because it aggravated his back and neck pain. (*Id.* at 51–55) The depression and anxiety were manifested though isolation, sleeping, and withdrawal. (*Id.* at 56)

Walker also testified that he could only lift about five to ten pounds without pain in his shoulder, neck, and back. (*Id.* at 53) He could stand for an hour and sit for thirty minutes to an hour. (*Id.* at 54) He testified that he was attending a vocational rehabilitation program in expectation of finding a job. (*Id.*)

### 2. Walker's father's testimony

Walker's father testified that he and Walker perform most of the housework. (*Id.* at 58) However, Walker was limited in most everything he did. (*Id.*) For example, Walker had limited capacity for lifting or similar exertion and needed to rest and stretch a couple of times during each day. (*Id.*) Walker's father acknowledged that Walker complained of pain, but Walker did not seem affected by depression, as he was able to engage in discussions about politics. (*Id.* at 59–60)

9

### 3. Vocational expert testimony

The ALJ posed the following hypothetical to the vocational expert (the "VE"):

> [A] person who is 43 years of age on his onset, has 12th grade education plus a
> degree in biology and some nursing, past relevant work as just indicated, right
> handed by nature, suffering from generally mostly degenerative disc disease at the
> cervical and lumbar area, more at the cervical. He suffers from depression. Treats
> through his primary care doctor. And anxiety, somewhat relieved by his
> medications, without significant side effects, but he indicates in his testimony that
> he derives some drowsiness from one or a combination. And I find he's mildly
> limited in his ability to perform is [sic] ADL's; moderately limited in his ability to
> socialize; and moderately limited in his ability to maintain his concentration,
> persistence and pace, one-third of the working day. Due to his depression, anxiety
> and pain, and as a result would need to have simple, routine, unskilled jobs, [VE],
> SVP: 1 or 2 in nature. He appears to be able to attend tasks and complete
> schedules. Jobs that are low stress in nature, concentration and memory, and by
> that I mean jobs that have little decision-making or changes in the work setting or
> judgment to perform the work. One or two-step tasks. No production rate pace
> work. And jobs that would have little interaction with the public, coworkers or
> supervisors at this time. Jobs that allow him to deal with things rather than people.
> And if I find he can lift ten pounds frequently, 20 on occasion; and stand for an
> hour; can sit for an hour consistently on an alternate basis or at will; but would
> need to avoid heights and hazardous machinery, temperature and humidity
> extremes; and only occasional fine dexterity manipulation due to occasional
> numbness in his upper extremities; and no repetitive neck turning jobs or
> overhead reaching or stair climbing. All of these things during the usual and
> customary breaks that allowed during a work day. Now with those limitations he
> would be able to do some sedentary and light work activities, can you give me
> jobs such a person could do with those limitations?

(*Id.* at 61–62)  The VE testified that at the light exertional level, the individual described would

be able to work in occupations including hand bander, folder, or filler.  (*Id.* at 62)  The VE

further testified that at the sedentary level, the individual described would be able to work in

occupations including type copy examiner and surveillance system monitor.  (*Id.* at 63)  The VE

explained that none of Walker's prior work experience would apply. (*Id.*)

### 4. The ALJ's findings

Based on the factual evidence in the record and the testimony of Walker, his father, and

the VE, the ALJ determined that Walker was not disabled under the Act for the relevant time

period from March 25, 2010 through the date of the ALJ's decision, October 26, 2012. (*Id.* at

20) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since March 25, 2010, the alleged onset date.

3. The claimant has the following severe impairments: depression and cervical/lumbar degenerative disc disease (DDD).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except; he must be able to sit for 1 hour, stand for 1 hour consistently on an alternative basis, 8 hours a day, 5 days a week. He must avoid temperature and humidity extremes, heights, hazardous machinery and the climbing of stairs. There [sic] job must not involve repetitive neck turning or overhead reaching. He can only occasionally use his bilateral upper extremities for fine dexterity manipulation. He can only perform simple routine unskilled jobs in nature that involve low concentration, stress and memory with no decision-making, judgment, or changes in the work setting and no production pace work, 1-2 step jobs. He can only occasionally interact with co-workers, the public and supervisors.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on February 12, 1967 and was 43 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 25, 2010, through the date of this decision.

(*Id.* at 22–31) (citations omitted)

## III.    STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). Courts have embraced this standard in determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56, as well. *See e.g., Barnhill v. Astrue*, 794 F. Supp. 2d 503, 513 (D. Del. 2011), *reconsideration denied*, 2011 WL 2693910 (D. Del. July 11, 2011).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

13

A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment,

either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B.   Whether the ALJ's Decision is Supported by Substantial Evidence

On October 26, 2012, the ALJ found Walker was not disabled within the meaning of the Act during the relevant time period from the alleged onset date of March 25, 2010. (Tr. at 30) The ALJ concluded that Walker had the residual functional capacity to perform a range of light

unskilled and sedentary unskilled work. (*Id.*) After considering the VE's testimony, the ALJ

found that Walker could not return to his previous work, but that there were jobs that existed in

significant numbers in the national economy that Walker could perform. (*Id.*)

Walker asserts four arguments on appeal: (1) the ALJ improperly dismissed Walker's

mental impairments as non-severe; (2) the ALJ improperly discounted the medical opinions of

Walker's treating physicians; (3) the ALJ improperly evaluated Walker's credibility; and (4) the

ALJ improperly relied on the VE's expert testimony, which was based on a flawed hypothetical

proposing different impairments than those stated in the ALJ's opinion reciting RFC findings.

(D.I. 14 at 5)

### 1.  Substantial evidence supports the ALJ's finding that Walker's alleged mental impairments were not severe

Walker contends that the ALJ committed error in concluding his mental impairments do

not cause functional limitations (D.I. 14 at 7). Specifically, the ALJ failed to note Walker's

diagnosis of anxiety and his mental decompensation. (*Id.*)

To reach his conclusion that Walker did not have a severe mental impairment during the

relevant period, the ALJ assessed the four functional areas set out in the disability regulations for

evaluating mental disorders, known as the "paragraph B" criteria. *See* 20 C.F.R. § 404, Subpt. P,

App. 1 (2015); (Tr. at 23)  These areas include activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404, Subpt. P,

App. 1, at § 12.00(C).  To find a marked rather than mild limitation in one of these areas, the

impairment must be more than moderate, but less than extreme, and the limitation must seriously

interfere with the ability to function independently, appropriately, effectively, and on a sustained

basis. *Id.*

First, with respect to activities of daily living, the ALJ found that Walker had a mild restriction. (Tr. at 23) "[A]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C)(1). The ALJ based his finding primarily upon Walker's own testimony. In his testimony, Walker stated he was able to sweep, cook, and shop. (Tr. at 50–51) In August 2011, it was noted Walker could take care of his own personal hygiene, could perform simple chores, and occasionally drove. (*Id.* at 23) Accordingly, substantial evidence supports the ALJ's conclusion that Walker did not exhibit marked restriction in activities of daily living.

Second, the ALJ found a mild restriction in social functioning. (*Id.*) Initiating social contact with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *See* 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C)(2) (2015). Walker stated that he did not like socializing in person, but admitted to having conversations with others via telephone. (Tr. at 51) In August 2011, Walker stated he was able to get along with his co-workers and supervisors. (*Id.*) Therefore, there is substantial evidence to support the ALJ's finding that Walker's restriction in social functioning was only mild.

Third, the ALJ found that Walker has mild difficulties in the functional area of concentration, persistence, or pace. (*Id.* at 23) Walker stated that he experiences depression, however, during a consultative examination, Walker demonstrated good working memory and judgment. (*Id.* at 469–70) Dr. Simon also gave Walker a GAF score of 62 upon assessment, which indicates only mild symptoms of depression. (*Id.* at 656–60) Accordingly, substantial

evidence supports the ALJ's conclusion that Walker did not exhibit a marked restriction in concentration, persistence, or pace.

Finally, the ALJ found no episodes of decompensation of extended duration during the relevant time period. (*Id.* at 23) Because Walker's medically determinable mental impairments caused no more than mild limitations in any of the first three functional areas, and no episodes of decompensation of extended duration in the fourth area, the ALJ properly found that Walker's mental impairments were non-severe. *See Robinson*, 2015 WL 5838469, at *13–14. Walker asserts the ALJ did not consider his hospitalization for depression and anxiety with a GAF of 40 from July 8, 2009 to July 14, 2009, or his admittance into a drug rehabilitation facility for an addiction to pain medication from June 2010 to October 2010. (D.I. 11 at 7) Walker's hospitalization for depression and anxiety does not meet the standard for mental decompensation of extended duration. To qualify, there must be "three episodes in 1 year, or an average of once every four months, each lasting two weeks." 20 C.F.R. § 404, Subpt. P, App. 1 (2016). Walker also asserts the ALJ improperly discounted the opinions of Walker's treating physicians regarding his mental impairments in determining his RFC. (D.I. 11 at 7–8) However, there is no evidence of medical opinions introduced by Walker that would support finding "anxiety" as a severe impairment. The ALJ properly considered Walker's depression and related mental functions in his analysis. Walker improperly conflates the mental function analysis with the RFC. The ALJ correctly evaluated Walker's mental function limitations at steps 2 and 3 of the sequential evaluation, and incorporated such limitations in his RFC assessment at steps 4 and 5. Furthermore, Dr. Simon's treatment notes and GAF score contradict the assertion that Walker was severely limited by anxiety. (*Id.* at 656–60) Additionally, the ALJ's RFC assessment reflects limitations for work involving low concentration, stress and memory with no decision-

18

making, judgment, or changes in the work setting. (*Id.*) The ALJ further limits Walker to jobs that require no production pace work, and only occasional interaction with co-workers, supervisors, and the public. (*Id.*) Consequently, the court finds there is substantial evidence to support the ALJ's finding that Walker's anxiety was not severe and there were no periods of decompensation of extended duration during the relevant period.

## 2. The ALJ properly weighed the objective medical evidence and opinions of treating physicians

To determine the proper weight to give to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)–(4) (2012). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* § 404.1527(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, Civil Action No. 12-920-SRF, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician—one who has an "ongoing treatment relationship" with the patient—is entitled to special significance. 20 C.F.R. §404.1502; *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if unsupported by clinical and laboratory diagnostic findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*,

247 F.3d at 42–43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *12 (D. Del. Oct. 5, 2015). Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id*.

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000); *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present action, the ALJ gave great weight to treating physician Dr. Bose's limitation restricting Walker to lifting not more than 25 pounds because the findings were consistent with other treatment records. (Tr. at 28, 429) However, the ALJ afforded less weight to Dr. Bose's March 26, 2010 and September 27, 2010 opinions that Walker could not work for six to twelve months, respectively, as the restrictions were inconsistent with post-surgery records, which do not show that pain would have prevented Walker from working. (*Id*.) Specifically, the opinions contradicted Dr. Bose's own assessment that Walker could resume normal activity on January 4, 2010. (*Id*. at 270) He recommended that Walker start a physical therapy program multiple times. (*Id*. at 425, 427, 428) On March 26, 2010, the same day as the

20

note restricting Walker from work, Dr. Bose wrote in his examination notes that Walker was overall improving. (*Id.* at 427)  By June 22, 2010, Dr. Bose noted that although there was some back pain following two falls, Walker's neck was doing well, he had no tenderness on palpation, his alignment was good, he was mildly restricted in range of motion, and there was no deficiency with his motor functioning. (*Id.* at 426)  Given these inconsistencies, the ALJ had sufficient reason to assign less weight to Dr. Bose's March 26, 2010 and September 27, 2010 notes, which were unsupported by the objective medical evidence in the record.  There is substantial evidence to support the ALJ's decision in this regard.

The ALJ also gave little weight to Dr. Ivins' RFC check mark questionnaires that indicated significant physical and mental limitations. (*Id.* at 28, 520–29)  Walker admitted that medication and changing positions helped his pain, and that his pain was stable with light activity. (*Id.* at 28, 724, 730)  Dr. Ivins' restriction on sitting and standing for no longer than fifteen minutes conflicts with the opinion of State agency consultant, Dr. Gurcharan, that Walker, with normal breaks, could sit for six hours and stand for two hours in a given eight hour work day. (*Id.* at 484)  Moreover, Walker testified that he could sit and stand for about an hour without pain. (*Id.* at 54)  Dr. Ivins indicated that depression and pain would frequently interfere with Walker's work day, but the State agency consultant, Dr. Campion, opined that Walker had only mild limitations on concentration. (*Id.* at 522, 674)  Contrary to Dr. Ivins' opinion, Dr. Bose repeatedly reported that Walker was improving, and post-surgery examinations did not show that Walker was significantly physically limited. (*Id.* at 28, 426–27, 436–39, 473, 537, 659, 730, 763, 766, 776)  Despite these inconsistencies, the ALJ gave Walker the "benefit of the doubt" and provided limitations in the RFC, including the need to alternate between sitting and standing, and to work in an area requiring minimal amounts of concentration and stress. (*Id.* at

24, 29)  Therefore, substantial evidence supports the ALJ's determination that Dr. Ivins'

February 4, 2011 disability certification did not warrant significant weight.

Furthermore, although the ALJ did not mention Dr. Lim's medical certifications

indicating that Walker was incapable of work, the June 24, 2011 certification facially contradicts

itself by stating that Walker could perform "light duty work."  (*Id*. at 531)  The court assigns no

error in not relying on this evidence.  For these reasons, the ALJ's decision to assign less weight

to the opinions of Walker's treating physicians is supported by substantial evidence.

### 3.  The ALJ properly weighed Walker's credibility

An ALJ must undertake a two-step process in evaluating a claimant's subjective

complaints of pain.  *See* 20 C.F.R. § 404.1529; SSR 96-7p at 2; *see also Conn v. Astrue*, 852 F.

Supp. 2d 517, 527 (D. Del. 2012).  First, the ALJ must determine whether there is an impairment

that could reasonably be expected to produce the claimant's pain.  *See Conn*, 852 F. Supp. 2d at

527.  Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the

symptoms to determine the individual's work limitations.  *Id*.  When subjective complaints of

pain are unsubstantiated by objective medical evidence, the ALJ must evaluate the claimant's

credibility based on the entire record.

In addition to the objective evidence, the ALJ should consider factors such as the

claimants daily activities; locations, duration, and frequency of pain; aggravating factors; the

effectiveness of medication and other treatment; and the consistency of the claimant's

statements.  *See Fletcher v. Colvin*, Civil Action No. 12-920-SLR-SRF, 2015 WL 602852, at *11

(D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar.

19, 2015).  The ALJ must specifically support the decision based on evidence in the record "to

give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned...decision." *Id.* (quoting *Conn*, 852 F. Supp. 2d at 527).

The ALJ found that Walker did experience symptoms from his impairments, but "[t]he medical evidence of the record does not support [Walker's] allegations that he is completely unable to perform any work activities." (Tr. at 27)  Instead, the ALJ found that treatment notes did not substantiate the level of physical or mental impairment claimed.  (*Id.*)  For example, Walker was repeatedly advised to start or continue physical therapy.  (*Id.* at 27, 425–28)  Moreover, State consultant Dr. Watson found that Walker's cognitive abilities were average, his medications helped his depression and anxiety, his attention and concentration were good, and his depression and anxiety were in remission.  (*Id.* at 467–71, 656–60)  The ALJ analyzed medical records from before and after Walker's surgery and observed overall progress.  (*Id.* at 24–29)

Walker asserts that his disability argument is supported by the opinion of State agency consultant, Dr. Heath, who opined that Walker was physically limited, including the inability to lift more than five pounds.  (D.I. 14 at 16; Tr. at 474)  However, as the ALJ noted, Dr. Heath also reported that Walker's upper extremity motor strength was not limited, contradicting her own report.  (Tr. at 28, 473)  Further, in assigning a lifting limitation, Dr. Heath noted that the limitation had to be further clarified by a functional capacity evaluation.  (*Id.* at 474)

The ALJ was not persuaded by Walker's complaints.  (*Id.* at 27)  The ALJ noted that Walker lived with his elderly parents, performed many chores, attended vocational rehabilitation classes, and indicated that he was hopeful of finding employment.  (*Id.*)  Accordingly, the ALJ determined that although Walker's impairments could reasonably be expected to cause his

alleged symptoms, his statements concerning intensity, persistence, and limiting effects were not credible, as they were inconsistent with the RFC. (*Id.*)

The ALJ did not completely reject Walker's testimony, as he found that Walker cannot return to his position as a nurse. (Tr. at 29)  The ALJ's finding is given deference due to his opportunity to observe and hear the claimant's testimony. *See Coleman v. Comm'r of Soc. Sec.*, 494 F. App'x 252, 254 (3d Cir. 2012).  Therefore, substantial evidence supports the ALJ's credibility finding—that Walker's subjective complaints concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the record. (Tr. at 27)

### 4.  The ALJ properly relied on the VE's testimony

Walker's final argument is that the ALJ improperly relied on the VE's testimony with regard to Walker's RFC. (D.I. 14 at 17–18)  Walker asserts the ALJ's decision contradicts the VE's hypothetical regarding available jobs in the work place, because it did not take into account the VE's statement that a decrease in a person's work productivity by 15 to 20% can be work preclusive. (*Id.*)  Walker's second argument is that the ALJ's hypothetical question posed to the VE did not match the RFC finding. (*Id.* at 17–18)

The ALJ's decision does not inherently contradict the VE's testimony.  Despite mental and physical limitations, the VE opined that Walker is capable of performing certain jobs in the national economy to the fullest extent required by those positions. (Tr. at 61–64)  In other words, Walker would be able to perform the suggested jobs without any reduced production because the positions already account for his limitations.  Moreover, if the ALJ finds the VE's hypothetical not supported by the record, the ALJ has the "authority to disregard the response." *See Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004).  The ALJ gave great weight to Dr.

Simon and Dr. Watson who found Walker was "mildly limited in social interaction and concentration." (Tr. at 28)  The ALJ concluded Dr. Simon and Dr. Watson's findings were consistent with Walker's RFC. (*Id.*)  The ALJ also gave great weight to the State agency consultants who found that Walker could "perform light work with some postural/environmental limitations." (*Id.*)  Therefore, the ALJ was not required to accept the VE's testimony that reduction in productivity would be work preclusive because it was not a limitation he found credibly supported by the record. *See Jones*, 364 F.3d at 506.

Moreover, the ALJ did rely on the VE's testimony in response to the hypothetical.  An ALJ's hypothetical RFC proposed to a VE must accurately portray the claimant's mental and physical impairments, otherwise, the ALJ cannot substantially rely on the VE's response. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).  However, if the ALJ's hypothetical substantially includes all limitations contained in its decision, even if not worded exactly the same, the court should find that substantial evidence supports the ALJ's finding. *See Dawson-Rhoades v. Barnhart*, Civil Action No. 03-627 GMS, 2008 WL 906107, at *4 (D. Del. Mar. 27, 2008).

A side by side comparison of the relevant language in the hypothetical and the written decision shows the consistency of the limitations as follows:

| **Hypothetical** | **Written Decision** |
| --- | --- |
| • "stand for an hour; can sit for an hour consistently on an alternate basis or at will" | • "must be able to sit for 1 hour, stand for 1 hour consistently on an alternate basis, 8 hours a day, 5 days a week" |
| • "would need to avoid heights and hazardous machinery, temperature and humidity extremes" | • "must avoid temperature and humidity extremes, heights, hazardous machinery and the climbing of stairs" |
| • "no repetitive neck turning jobs or overhead reaching or stair climbing" | • "job must not involve repetitive neck turning or overhead reaching" |

25

| | |
|---|---|
| • "only occasional fine dexterity manipulation due to occasional numbness in his upper extremities"<br>• "can lift ten pounds frequently, 20 on occasion" | • "can only occasionally use his bilateral upper extremities for fine dexterity manipulation" |
| • "moderately limited in his ability to maintain his concentration, persistence and pace, one-third of the working day"<br>• "jobs that are low stress in nature, concentration and memory, and by that I mean jobs that have little decision-making or changes in the work setting or judgment to perform the work"<br>• "one or two-step tasks"<br>• "no production rate pace work"<br>• "due to his depression, anxiety and pain, and as a result would need to have simple, routine, unskilled jobs, [VE], SVP: 1 or 2 in nature"<br>• "he appears to be able to attend tasks and complete schedules" | • "can only perform simple routine unskilled jobs in nature that involve low concentration, stress and memory with no decision-making, judgment, or changes in the work setting and no production pace work, 1-2 step jobs" |
| • "jobs that would have little interaction with the public, coworkers or supervisors at this time"<br>• "jobs that allow him to deal with things rather than people"<br>• "moderately limited in his ability to socialize" | • "can only occasionally interact with co-workers, the public and supervisors" |
| • "he would be able to do some sedentary and light work activities"<br>• "all these things during the usual and customary breaks that [sic] allowed during a work day" | • "residual functional capacity to perform light work" |
| (Tr. at 61–62) | (Id. at 24) |

The hypothetical and RFC wording need not be identical, as the analysis instead turns on whether an ALJ properly relied upon the response to a hypothetical that accurately captures the claimant's individual impairments supported by the record. *See Money v. Barnhart*, 91 F. App'x

210, 213–14 (3d Cir. 2004) (ALJ properly relied on the VE's testimony in response to his hypothetical where the ALJ incorporated impairments substantiated by the record in the hypothetical). If there are no critical differences between the hypothetical and the RFC findings, then substantial evidence supports the ALJ's findings.

As shown in the chart above, the hypothetical and the RFC findings mirror each other, and the ALJ adequately represented Walker's limitations in both the hypothetical and the RFC findings. For example, the ALJ addressed Walker's limited ability to socialize by finding that Walker "can only occasionally interact with co-workers, the public and supervisors." (Tr. at 24) Similarly, the ALJ addressed limitations on the ability to maintain concentration, persistence, or pace by restricting Walker to jobs "that involve low concentration, stress and memory with no decision-making." (*Id.*) That a person with this limitation could also attend tasks and complete schedules is not contradictory, and the finding is supported by the record. Finally, the side effect of drowsiness, although not explicitly stated, was adequately represented in the existing RFC limitations, as the ALJ considered it in his report and in making his overall findings. (*Id.* at 24–25)

Walker argues, however, that the ALJ made no findings as to how long he was able to engage in certain activities of daily living each day as related to substantial gainful activity in a job requiring a workday of eight hours, five days per week. (D.I. 14 at 17) Specifically, Walker argues the ALJ's decision did not include the VE's findings that Walker's limitations would apply 1/3 of the working day. (*Id.*) Walker's argument is vague and conclusory without factual or legal support. Walker's argument also ignores the ALJ's findings at step 5 of the sequential evaluation process. The ALJ's decision, as shown in the chart above, states that Walker could perform jobs with "low concentration, stress and memory with no decision-making, judgment, or

changes in the work setting and no production pace work, 1-2 step jobs." (Tr. at 24)  The ALJ also finds that Walker "must be able to sit for 1 hour, stand for 1 hour consistently on an alternate basis, 8 hours a day, 5 days a week." (*Id.*)  The VE's opinions are consistent with the ALJ's RFC findings stated in the decision.

Because the hypothetical posed to the VE accurately represented Walker's limitations, substantial evidence supports the ALJ's RFC determination.

## V.    CONCLUSION

For the foregoing reasons, (1) Walker's Motion for Summary Judgment (D.I. 13) is denied; and (2) the Commissioner's Cross Motion for Summary Judgment (D.I. 19) is granted.